UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
CHATTANOOGA DIVISION

JODI LAWSON,                           )
                                       )
          Plaintiff,                   )
                                       )
     vs.                               )          3:22-CV-351
                                       )
                                       )
COMMISSIONER OF SOCIAL                 )
SECURITY ADMINISTRATION,               )
                                       )
          Defendant.                   )

## MEMORANDUM OPINION AND ORDER

This matter is before the United States Magistrate Judge with the consent of the parties and by order of reference [Doc. 15] for disposition and entry of a final judgment. Claimant's application for supplemental security income was denied on July 23, 2021, following a hearing before an Administrative Law Judge ("ALJ"). This action is for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). Claimant has now filed a Complaint, Brief, and Reply [Docs. 4, 24 & 33] in this action while the Commissioner filed a Motion for Summary Judgment and Memorandum in Support [Docs. 31 & 32]. For the reasons set forth below, the relief requested in Claimant's Complaint, Brief, and Reply [Docs. 4, 24 & 33] is **DENIED**, and the Commissioner's Motion for Summary Judgment [Doc. 31] is **GRANTED**.

## I.     APPLICABLE LAW – STANDARD OF REVIEW

A review of the Commissioner's findings is narrow. The Court is limited to determining (1) whether substantial evidence supported the factual findings of the Administrative Law Judge ("ALJ") and (2) whether the Commissioner conformed to the relevant legal standards. 42 U.S.C. § 405(g); *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009). "Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *see also Mebane v. Comm'r of Soc. Sec.*, 382 F. Supp. 3d 718, 721 (S. D. Ohio 2019). "It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury." *LeMaster v. Sec'y of Health & Human Servs.*, 802 F.2d 839, 840 (6th Cir. 1986). The Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849 (6th Cir. 2020). At the same time, the Court may consider any evidence in the record, regardless of whether it was cited by the ALJ. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001); *see also Kushner v. Comm'r of Soc. Sec.*, 354 F. Supp. 3d 797, 802 (E.D. Mich. 2019). A decision supported by substantial evidence must stand, even if the evidence could also support a different decision. *Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 395 (6th Cir. 2010) (citing *Blakely*, 581 F.3d at 405); *see also Richardson v. Saul*, 511 F. Supp. 3d 791, 797 (E.D. Ky. 2021). On the other hand, a decision supported by substantial evidence "will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007); *see also Ackles v. Comm'r of Soc. Sec.*, 470 F. Supp. 3d 744, 752 (N.D. Ohio 2020).

A claimant must suffer from a "disability" as defined by the Act to be eligible for benefits. "Disability" includes physical and mental impairments that are "medically determinable" and so severe as to prevent the claimant from (1) performing his past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. 42 U.S.C. § 423(a). A five-step sequential evaluation applies in disability determinations. 20 C.F.R. § 404.1520. The ALJ's review ends with a dispositive finding at any step. *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). A full review addresses five questions:

1.      Has the claimant engaged in substantial gainful activity?

2.      Does the claimant suffer from one or more severe impairments?

3.      Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the "Listings"), 20 C.F.R. Part 404, Subpart P, Appendix 1?

4.      Considering the claimant's Residual Functional Capacity ("RFC"), can he or she perform his or her past relevant work?

5.      Assuming the claimant can no longer perform his or her past relevant work, and also considering the claimant's age, education, past work experience, and RFC, do significant numbers of other jobs exist in the national economy which the claimant can perform?

*See* 20 C.F.R. § 404.1520.  A claimant bears the burden of establishing entitlement to benefits by proving the existence of a disability. *See Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *see also Bowermaster v. Comm'r of Soc. Sec.*, 395 F. Supp. 3d 955, 959 (S.D. Ohio 2019). It is the Commissioner's burden to establish a claimant's ability to work at step five. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990); *see also Jones v. Berryhill*, 392 F. Supp. 3d 831, 855 (M.D. Tenn. 2019).

## II.      PROCEDURAL AND FACTUAL OVERVIEW

Jodi Lawson ("Claimant") filed for supplemental security income on February 4, 2020, alleging that her disability onset date was the same as her date of filing for benefits. (Tr. 4).  The claim was denied initially and on reconsideration. *Id.*  Thereafter, Claimant requested a hearing, which was conducted by Administrative Law Judge Jim Beeby ("ALJ") via online video on July 14, 2021. (Tr. 4). Following the final hearing, the ALJ issued a decision on July 23, 2021, finding that Claimant was not disabled. (Tr. 1). In his decision, the ALJ made the following findings:

1.      The claimant has not engaged in substantial gainful activity since February 4, 2020, the application date;

3

2. The claimant has the following severe impairments: Vision disorder and anxiety disorder;

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1;

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant is limited to gross monocular vision, but can read large print, avoid ordinary hazards, view a computer screen and determine the differences in shape and color of small objects such as nuts, screws or bolts. The claimant can acceptably relate with supervisors and co-workers, but should have no direct contact with the public, working better with things than with people. The claimant should not drive an automobile;

5. The claimant has no past relevant work;

6. The claimant was born on September 19, 1977 and was 42 years old, which is defined as a younger individual age 18-49, on the date the application was filed;

7. The claimant has at least a high school education;

8. Transferability of job skills is not an issue because claimant does not have past relevant work;

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform;

10. The claimant has not been under a disability, as defined in the Social Security Act, since February 4, 2020, the date the application was filed.

*See* (Tr. 6-15). Claimant subsequently requested Appeals Council review, but the request was denied. (Tr. 20). As a result, the ALJ's decision ("the decision") became the final decision of the Commissioner of Social Security. *Id*.

On appeal, while Claimant sets forth three issues for review, they all stem from a single primary issue. That issue is whether the ALJ erred in formulating Claimant's RFC because he did not properly consider the limitations Claimant experiences due to her vision disorder. [Doc. 24, p. 8]. More specifically Claimant contends that the ALJ "played doctor" in formulating her RFC

instead of properly assessing the medical evidence of record and utilizing it when formulating her RFC. *Id.* at 9-10. Finally, Claimant asserts that the ALJ failed to build a logical bridge between the limits caused by Claimant's vision impairments and the RFC he formulated. *Id.* at 7.

In response, the Commissioner contends both that the ALJ applied the correct legal standard, and that substantial evidence supports his opinion. [Doc. 32, p. 4, 12]. In support, the Commissioner states that the ALJ properly assessed the medical evidence of record and points to portions of the record where Claimant's own activity reports purportedly contradict some of the limitations Claimant states she experiences. *Id.* at 4-13.

In order to properly address the issues raised and the parties' arguments, the Court has reviewed the parties' filings and evidence contained in the transcript filed in this matter. More specifically, the Court has reviewed and considered Claimant's medical records, the reports of consultative examiners, and completed medical assessments of ability to do work-related activities and will address them as necessary to fully analyze the issues in contention. (Tr. Ex. 1F-14F). The Court notes that the records contained in Exhibits 6F, 8F-9F and 13F-14F were generated on or after the alleged onset date, Exhibits 1F-3F and 11F-12F contain records which all predate the alleged onset, and Exhibits 4F-5F, 7F, and 10F contain records from both before and after the alleged onset date. Additionally, the Court has reviewed and considered the opinions provided by state agency medical consultants on initial consideration and reconsideration of Claimant's applications for benefits. (Tr. Ex. 1A-4A). Lastly, the Court has reviewed and considered the hearing testimony and other filings made by Claimant regarding her condition. (Tr. 34-54; Tr. Ex. 1E-15E, 17E, and 22E). Having done so, the Court will now address the errors alleged by Claimant in the context of the parties' arguments and applicable law.

## III.    LEGAL ANALYSIS

### a. *Standard of Review*

As referenced above, Claimant asserts that the ALJ erred in assessing the medical evidence of record, which in turn caused him to err in formulating her RFC. *See* 20 C.F.R. § 404.1520 (noting that step four of an ALJ's five question review involves formulating a claimant's residual functional capacity). In reviewing Claimant's contention, the Court must keep in mind that the ALJ was entitled to a "zone of choice" in determining whether Claimant was disabled and if the facts could support a ruling either way, then the ALJ's decision must be upheld. *Blakely*, 581 F.3d at 406. As such, the Court will not disturb the ALJ's decision even if the Court would have decided the matter differently so long as the ruling was rendered in compliance with applicable law and is based on substantial evidence. "Substantial evidence exists when a reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Stewart v. Comm'r of Soc. Sec.*, 811 F. App'x 349, 352 (6th Cir. 2020) (internal citations omitted); *Fox v. Comm'r of Soc. Sec.*, 827 F. App'x 531, 534 (6th Cir. 2020) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154, 203 L.Ed.2d 504 (2019)).

As part of the multi-step review of a Social Security case, the ALJ must make a residual functional capacity determination. *See* 20 C.F.R. § 404.1520. "Residual Functional Capacity" means "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs. . .." 20 C.F.R. § Pt. 404, Subpt. P, App. 2(c). Applicable regulations provide the following guidance for the agency when assessing a claimant's RFC:

> When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.

20 C.F.R. § 404.1545(b).

In rendering a decision about a claimant's RFC, an ALJ is prohibited from "defer[ring] or giv[ing] any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the Claimant's] medical sources." 20 C.F.R. § 404.1520c. Instead of simply deferring to medical sources, an ALJ is required to consider multiple factors in evaluating the evidence including (1) supportability; (2) consistency; (3) a source's relationship with the Claimant; (4) specialization; and (5) other supporting or contradicting factors. 20 C.F.R. § 416.920c. As courts have noted in applying this rule, "[s]upportability and consistency will be the most important factors, and usually the only factors the ALJ is required to articulate." *Jones v. Berryhill*, 392 F. Supp. 3d 831, 839 (M.D. Tenn. 2019) (citing *Pogany v. Berryhill*, No. 4:18-CV-04103-VLD, 2019 WL 2870135, at *27 n. 7 (D.S.D. July 3, 2019)) (internal quotations omitted). In assessing whether a medical opinion is supportable, the focus is on the relevance of the objective medical evidence and supporting explanations upon which the opinion is based. In other words, "[t]he more relevant the objective medical evidence and supporting explanations…, the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1). In considering consistency, the focus is on how the opinions provided square with the overall record. Specifically, "[t]he more consistent a medical opinion(s)… is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s)… will be." 20 C.F.R. § 404.1520c(c)(2).

Despite a change in the law which reduced the articulation required of ALJs when rendering their decisions, that change did not relieve ALJs of their responsibility to provide clear explanations as to their reasoning. Even under these reduced articulation requirements, ALJs must "provide a coherent explanation of their reasoning, clearly explain their consideration of the

opinion and identify the evidence supporting their conclusions, and otherwise explain how they considered the supportability and consistency factors as to each medical opinion." *Kirkland v. Kijakazi*, No. 3:22-CV-60-DCP, 2023 WL 3205330, at *9 (E.D. Tenn. May 2, 2023) (quoting *White v. Comm'r of Soc. Sec.*, No. 1:20-CV-00588-JDG, 2021 WL 858662, at *21 (N.D. Ohio Mar. 8, 2021)); *Lester v. Saul*, No. 5:20-CV-01364, 2020 WL 8093313, at *14 (N.D. Ohio Dec. 11, 2020); *Warren I. v. Comm'r of Soc. Sec.*, No. 5:20-CV-495 (ATB), 2021 WL 860506, at *8 (N.D.N.Y. Mar. 8, 2021)) (internal citations omitted). "In other words, the ALJ must 'build an accurate and logical bridge between the evidence and the ALJ's conclusion.'" *Id.* (quoting *Todd v. Comm'r of Soc. Sec.*, No. 3:20-cv-1374, 2021 WL 2535580, at *6 (N.D. Ohio June 3, 2021)).

Then, when considering a claimant's subjective statements about symptoms, the ALJ must consider both the medical and relevant nonmedical evidence. *Thompson v. Saul*, No. 5:20-CV-00002-MAS, 2021 WL 895624, *3 (E.D. Ky. Mar. 9, 2021). Of note, if there is a discrepancy between the claimant's subjective complaints and the objective medical evidence relating to the degree of impairment-related symptoms, the ALJ should not necessarily "disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms." Social Security Ruling 16-3p. Instead, the regulations require the ALJ to consider factors relevant to the claimant's symptoms such as the claimant's daily activities; the duration, frequency, and intensity of symptoms; precipitating and aggravating factors; the type and effectiveness of any medication; and any other treatment or measures to alleviate symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Notably, the Social Security Administration no longer uses the term "credibility" when evaluating a claimant's subjective symptoms, but rather ALJs are directed to consider all evidence of record in conjunction with the above-listed factors. Social Security Ruling 16-3p. At the same time, ALJs are not required to discuss every factor in the list. *Corinne C. v. Comm'r of*

*Soc. Sec.*, No. 1:20-CV-1034, 2022 WL 1590818, *15 (S.D. Ohio May 19, 2022) (citing *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009)).

### b.  *ALJ's Treatment of Medical Opinions of Record Addressing Claimant's Vision Condition*

The Court first turns to assessing the ALJ's treatment of the medical evidence of record. The medical information contained in the record regarding Claimant's vision issues can be described as sparse, at best. In fact, it appears that there are only medical records from four appointments during which Claimant's vision issues were assessed. (Tr. Ex. 1F, 5F, 6F, and 9F).[1] Claimant's medical records from other treating providers are almost fully void of any references to Claimant experiencing eye difficulties.

In support of her assertion that her vision condition prevents her from working, Claimant first points to a letter written by Edward F. "Ted" Cherney, M.D. with the Vanderbilt Eye Institute following his assessment of Claimant on December 1, 2015. (Tr. Ex. 1F, p. 287). The letter was directed to Claimant's treating ophthalmologist, Timothy Powers, M.D. *Id.* Dr. Cherney noted that Claimant had 20/400 vision in her right eye and 20/200 in the left, specifically noting that she had blurred vision and "very unusual iris atrophy with transilliumination defects in both eyes." *Id.* It appears that this was the only time that Dr. Cherney saw Claimant, although in his letter he advised that other testing was to be scheduled. *Id.* While the Court agrees that this letter supports the contention that Claimant has significant vision issues, Claimant states that the vision problems which prevent her from working did not actually begin until mid-2019. This is further supported by the fact that Claimant appears to have continued driving until sometime in 2020. Claimant testified that she had stopped driving in the year preceding the ALJ hearing, which was held in July of 2021, because another doctor had instructed her to stop. (Tr. 44, 46). Additionally, after

---

[1]  The Court has not included in this total the treatment Claimant received at the Big South Fork Medical Center in the emergency room. Although those records document that Claimant injured her left eye in a fall, her injuries are described as to the area around the eye as opposed to being to the eye itself. Claimant makes no mention of having vision issues during her treatment on this occasion. (Tr. Ex. 2F, p. 296).

her visit with Dr. Cherney, Claimant was able to work for at least some months in a job requiring work with a computer before ultimately quitting that job because she said she could not see well. (Tr. 49). Although this work did not qualify as substantial gainful activity, the type of work that Claimant was performing at that time does reflect on the level of visual functioning she retained after Dr. Cherney saw her.

Claimant's next documented vision evaluation of record was performed by Danny W. Cross, O.D. on March 6, 2018, the results of which he summarized in a letter dated March 17, 2020. (Tr. Ex. 5F, p. 445). In his letter, Dr. Cross noted that Claimant's best corrected vision was 20/200 in the right eye and 20/80 in the left eye at distance, with near vision being 20/200 in the right eye and 20/80 in the left eye with a bifocal add.[2] *Id.* Dr. Powers noted that there was corneal scarring, iris synechiae, and skewed pupils, with all being of unspecific origin. *Id.* He specifically diagnosed Claimant as having a loss of vision of unspecified origin, possible optic atrophy, and mixed tropia. *Id.* Claimant saw Dr. Cross again on May 29, 2020. (Tr. Ex. 6F, p. 446). At that time, Dr. Cross again diagnosed Claimant as having a loss of vision of unspecified origin and probable optic atrophy. *Id.* at 446-47. Dr. Cross further noted that the vision in Claimant's right eye was stable at 20/80.[3]

The only other assessment of Claimant's vision in the record is from her consultative examination with Katherine Laney, O.D., who saw Claimant on November 18, 2020. (Tr. Ex. 9F, p. 504). Dr. Laney found Claimant to have significant issues with her vision, noting that Claimant's cornea, iris, and pupils indicated a history of inflammation. *Id.* at 506. She further noted that Claimant's acuity and field findings met the definition of legal blindness; however, Dr. Laney also noted that Claimant's test results were unreliable due to a very high rate of false negatives. *Id.* Dr.

---

[2] While Dr. Cross uses the medical terms O.S., the Latin term for left eye, and O.D., the Latin term for the right eye, in his records, the Court has chosen to use "left eye" and "right eye" for readability.
[3] It appears from Claimant's other optic records, that Dr. Cross was referring to Claimant's left eye instead of the right.

Laney's records also note that Claimant reported vision issues to have started about six months prior to her appointment. *Id.* at 508.

In addition to using the medical opinions of those providing vision care to her in support of her claim for disability, Claimant also relies heavily on an opinion provided by nurse practitioner, Karla West, FNP, BC. Ms. (Tr. Ex. 10F). West provided a medical source statement in which she opined that Claimant had restrictions including that she could not drive or climb ladders or scaffolds; that she could only occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl; that she was unable to avoid ordinary hazards in the workplace; that she was unable to read very small print, including print in an ordinary newspaper or book, or view a computer screen; and that she could not determine differences in the shape and color of small objects such as screws, nuts, or bolts. *Id.* at 518.

In assessing this evidence, the ALJ found only the opinion of Dr. Cross to be fully persuasive. (Tr. 10-13). He further found the opinion of Dr. Laney persuasive only as to the unreliability of Claimant's test results because Dr. Laney herself had found certain of Claimant's test results to be unreliable due to a high rate of false negatives. (Tr. 13). Additionally, the ALJ found that the opinions of Dr. Cherney were partially persuasive but so remote in time as not to be fully persuasive. (Tr. 11-12). He observed that, given the passage of time and the fact that Dr. Cherney's records were generated prior to Claimant's alleged onset date, any conflict between the findings in those records and the ones generated by Dr. Cross must be resolved in favor of finding Dr. Cross's opinions more persuasive. *Id.* Lastly, the ALJ determined that the opinions of Ms. West were unpersuasive because Ms. West candidly admitted that she did not treat Claimant for her vision issues, nor had she ever performed any eye tests on Claimant. (Tr. Ex. 10F, p. 518).

Claimant asserts that in both reaching these conclusions and in formulating Claimant's RFC, the ALJ "played doctor," which an ALJ is not permitted to do. *Simpson v. Comm'r of Soc. Sec.,* 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater,* 98 F.3d 966, 970 (7th Cir.

1996) (observing that "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings")). Specifically, Claimant asserts that "the ALJ rejected all relevant medical opinions related to the Plaintiff's vision loss and formulated an RFC based on his own lay opinion." [Doc. 33, p. 2]. However, Claimant's assertion is not fully accurate. The ALJ found the opinions of Dr. Cross, Claimant's most recent treating optometrist to be fully persuasive. (Tr. 11). At the same time, the Court recognizes that Dr. Cross did not provide a specific assessment of Claimant's ability to work in the context of her vision difficulties, and it appears that Claimant contends that without such an assessment, Dr. Cross's medical records were nothing more than raw data which the ALJ was left to interpret, which in turn led him to play doctor.

In asserting that the ALJ played doctor, Claimant also leans heavily on the opinion of Ms. West, who checked boxes stating that Claimant was "not able to avoid ordinary hazards in the workplace" and was unable to "determine differences in the shape and color of small objects such as screws, nuts, or bolts." (Tr. Ex. 10F, p. 518). However, medical opinions provided through a check-the-box format are considered "weak evidence at best." *Gladson v. Saul*, No. 6:20-064-DCR, 2020 WL 6689196, at *7 (E.D. Ky. Nov. 12, 2020) (quoting *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 473 (6th Cir. 2016)) (internal quotation omitted); *see also Smith v. Astrue*, 359 F. App'x 313, 316 (3rd Cir. 2009) ("checklist forms…which require only that the completing physician 'check a box or fill in a blank' rather than provide a substantive basis for the conclusions stated are considered 'weak evidence at best' in the context of a disability analysis.") (citations omitted). Moreover, in the same form that Claimant relied on so heavily, Ms. West specifically advised that "PCP does not eval[uate] vision." *Id.* Further, Ms. West does not provide a written explanation anywhere in the form which provides a basis for the opinions offered in it. Lastly, Ms. West's own records summarizing Claimant's treatment are almost completely devoid of any mention of Claimant's vision issues. In fact, the Court located only one reference to Claimant's vision issues in Ms. West's records, which was included in Ms. West's notes from Claimant's visit

on July 9, 2020, at which time Claimant reported spots in her vision and headaches. (Tr. Ex. 13F, p. 599).

In addition to finding that Ms. West's opinions were unpersuasive because she had not treated Claimant for vision problems and provided no basis for her opinions regarding Claimant's vision, the ALJ also specifically addressed the ways in which Ms. West's opinions conflicted with the records from vision specialists, particularly optometrist Danny Cross, O.D. and consultative examiner, Katherine Laney, O.D., and with Claimant's own reports of the activities in which she engaged.[4] (Tr. 10-11). Given these facts, the Court cannot find that the ALJ erred in rejecting the opinions of Ms. West regarding Claimant's visual impairments, after finding that they were not supported by or consistent with the evidence of record, including the records she had generated from her treatment of Claimant.

The Court also cannot overlook the fact that despite Claimant's assertions regarding the severity of her vision issues, she had her vision assessed by an ophthalmologist or optometrist only four times in roughly five years. Of note, one of those appointments was with Dr. Laney for a consultative examination. While Claimant says she was told that nothing could be done to improve her vision, that is not reflected in her vision records. Those records also do not reflect that Claimant sought other options for treatment. Instead, it appears from Dr. Cherney's treatment note summarizing Claimant's 2015 visit that there was additional testing he asked her to undergo but there is no evidence of record reflecting that she ever underwent this additional testing. The Court acknowledges that in these types of cases, a claimant is often unable to obtain necessary testing and/or treatment due to a lack of insurance. However, in the case at hand, the record reflects that Claimant had health insurance. (Tr. Ex. 8F, p. 500). Given that Claimant bore the burden of establishing the existence of a disability, and because there is no indication in the record that she

---

[4] The Court finds that the ALJ correctly concluded that Claimant's reported activities are not fully consistent with the limitations that Ms. West assigned related to Claimant's vision. These inconsistencies will be addressed more fully in the portion of the opinion addressing the ALJ's RFC determination.

was unable to obtain treatment solely for financial reasons, her failure to seek treatment is a factor that may be considered against her. *See Watters v. Comm'r of Soc. Sec.,* 530 F. App'x 419, 424 (6th Cir. 2013).

### c. *ALJ's Determination that Claimant Retained Adequate Vision to Perform Work and Should Not Drive*

Having found that the ALJ did not err in how he considered the medical evidence of record regarding Claimant's vision, the Court will turn to Claimant's contention that the ALJ erred in how he used that medical evidence in formulating her RFC. As set forth above, the ALJ found that Claimant had the following non- exertional limitations:

> The Claimant is limited to gross monocular vision, but can read large print, avoid ordinary hazards, view a computer screen and determine the differences in shape and color of small objects such as nuts, screws or bolts. The claimant can acceptably relate with supervisors and co-workers, but should have no direct contact with the public, working better with things than with people. The claimant should not drive an automobile[.]

(Tr. 9).

As noted above, Claimant argues that the ALJ imposed these limitations by "playing doctor" and in doing so appears to take the position that the ALJ's list of non-exertional limitations had to come directly from one of Claimant's medical providers. Claimant appears to further argue that the ALJ "played doctor" by interpreting raw medical data in formulating her RFC but does not say what raw data he interpreted. While it is true that ALJs have been cautioned not to substitute their lay opinion in the place of the interpretation of a qualified medical professional, applicable law does not require that the ALJ base his RFC determination on any single medical opinion or combination thereof as to a Claimant's ability to do work, but rather on the entire record. *See* 20 C.F.R. §§ 416.945(a)(1).

In considering whether the ALJ had a proper foundation for the limitations he found applicable, the Court first observes that while Dr. Cross did not provide specific opinions about how Claimant's vision-related issues limited her ability to perform work, his records included

significant information about her vision difficulties which, when considered in conjunction with other evidence of record, provide a foundation for the ALJ's RFC determination. Additionally, when assessing any limitations that Claimant's vision conditions caused in her ability to work, the starting point for the ALJ was obtaining an accurate assessment of Claimant's vision itself. Dr. Cross clearly indicated that while Claimant was blind in one eye, she retained 20/80 vision in the other. This is the foundation the ALJ used to determine Claimant's limitations. Dr. Cross's vision records fully support the ALJ's finding that Claimant retained the ability to see at a functional level using monocular vision. The only vision records which indicate that Claimant possibly did not retain that ability were those from Dr. Cherney, which predated Claimant's alleged disability onset date, and those of consultative examiner Dr. Laney, who specifically stated that the findings were not reliable due to the number of false negatives present in Claimant's test results. For these reasons, the ALJ did not err in discounting the opinions of Drs. Cherney and Laney.

Although Claimant alleges the ALJ erred in finding that she retained the ability to perform work by using "gross monocular vision", asserting that the term is vague and undefined, the term "monocular" is defined in Merriam-Webster's Dictionary as "of, involving, or affecting a single eye" and "suitable for use with only one eye". *Monocular*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/monocular#:~:text=m%C9%99%2D-,1,use%20 with%20only%20one%20eye (last visited Aug. 12, 2024). In other words, the ALJ was simply limiting Claimant to tasks which could be performed using only the eye in which she was not legally blind. This is a term that has been used by other ALJs in formulating RFCs. *See Tina S. v. Kijakazi*, No. 3:21-CV-00266-CRS, 2022 WL 7265964 (W.D. Ky. July 29, 2022), *report and recommendation adopted*, No. 3:21-CV-266-CRS, 2022 WL 4595066 (W.D. Ky. Sept. 30, 2022). Given Dr. Cross's finding that Claimant retained 20/80 vision in one eye, the Court cannot find that the ALJ erred in determining Claimant could perform work using "gross monocular vision."

Additionally, the ALJ limited Claimant to jobs that did not involve driving and assigned several other limitations to Claimant in formulating her RFC. As to the limitation on driving, Claimant stated that Dr. Cross had instructed her not to drive due to her vision problems. Although Dr. Cross's records do not contain documentation of those instructions, the ALJ nevertheless imposed that limitation in formulating Claimant's RFC. As to the remaining limitations assigned by the ALJ in formulating Claimant's RFC, the Court finds it appropriate to address those limitations below in context of the medical evidence of record and Claimant's own reported limitations.

### d. ALJ's Consideration of Claimant's Reported Activities and Limitations in Formulating RFC

Claimant further asserts that the ALJ failed to properly credit her own testimony and other information she provided regarding the impact her vision limitations had on her ability to engage in activities. While Claimant testified during her hearing before the ALJ about her activities and limitations, that testimony was very limited. In this limited testimony, Claimant advised that her vision issues started about two years prior to the hearing, which would mean they began in approximately mid-2019. (Tr. 44). She further stated that she had not driven in over a year because her optometrist, Dr. Cross, had instructed her not to do so. *Id.* at 44, 46. Moreover, Claimant testified that she was unable to read books because of her vision issues but, at the same time, said she could read a newspaper with her glasses on if she held it close to her face. *Id.* Additionally, Claimant advised that she could watch television if she sat very close to the screen and could use a cellphone if she held it right up to her face. *Id.* She noted that she could also use her cellphone to text by enlarging the type and holding the phone up to her face. (Tr. 44, 48).

Despite this testimony, Claimant also stated that when she watched television and when she was trying to see the ALJ on the computer screen during the hearing, what she saw was simply

a "glob." (Tr. 47). Moreover, while testifying that she could read a newspaper if she held it up close and had her glasses on, Claimant said she could not see the disability paperwork sent to her and had to have help completing it. (Tr. 46). Additionally, although Claimant testified that her glasses helped her to see the newspaper, she also stated that the glasses did not correct her vision. *Id.* While Claimant could have meant that wearing her glasses only partially corrected her vision, the testimony she provided was not clear as to that point.

When asked about her ability to navigate inside and outside her home, Claimant testified that she was able to get around inside her home without difficulty and could perform housework, although with some difficulty. (Tr. 44, 48). Claimant said that she also walked on her own outside but advised that her daughter would walk close to her in case Claimant needed anything. Claimant noted that she has difficulty with stairs at times and that walking in parking lots was difficult because she had trouble seeing curbs. (Tr. 48-49).

In her hearing testimony, Claimant also provided information regarding a job that she held for a few months roughly two years prior to the hearing. (Tr. 49). Claimant explained that she performed work on computers and used a workbook, but she went on to say that she ultimately had to quit the job due to worsening vision. *Id.* Claimant did not provide any information about the type of work that she did, nor did she explain how she used the computer or workbook in performing the job. *Id.* Additionally, Claimant failed to explain what specific tasks she was having difficulty performing at the time she left this employment. *Id.*

Given Claimant's limited hearing testimony, the Court found it necessary to also pay particular attention to Claimant's prehearing submissions in assessing the conclusions reached by the ALJ as to Claimant's reported symptoms and limitations. For example, in a Function Report submitted on February 21, 2020, Claimant stated that she typically spent her days keeping her

mom company; performing housework and yardwork including laundry, cleaning, and mowing; watching "a little" television; and watching, bathing, and feeding the dogs. (Tr. Ex. 4E, p. 209, 210). She did not note any difficulties engaging in these activities. She further reported cooking a couple of nights a week and advised that she made "a little bit of everything" but did have someone read her the directions for recipes. *Id.* at 210. Claimant did say that she could not see well or drive and that it took her longer to do things because her eyes would start hurting and then "go blurry." *Id.* at 209-10. Then, in a Function Report that Claimant submitted on September 1, 2020, she advised that she continued to watch television but that she could not really see the television anymore. (Tr. Ex. 10E, p. 245). In that form, she also elaborated on the tasks she performed for her mother, which included dressing her and brushing her hair. *Id.* at 242.

Claimant also provided information regarding her living situation and daily activities during her psychological consultative examination with Carole Steele Ph.D., H.S.P. on June 15, 2020. (Tr. Ex. 8F, p. 499). In addition to sharing with Dr. Steele some of the information already set forth above, Claimant advised Dr. Steele that she served as the payee for her disabled adult son. *Id.* at 500. Additionally, Claimant expounded on the tasks she undertook at home, noting that she was able to prepare simple or more elaborate meals, wash dishes, vacuum, sweep, and do laundry. *Id.* at 502. Claimant further reported enjoying helping take care of her four-month-old grandson and painting suncatchers as a hobby. *Id.* While reporting in her February 2020 Function Report that she also did yardwork, Claimant later advised Dr. Steele on June 15, 2020 that she did not perform this type of work. *Id.* Dr. Steele's records further reflect that Claimant was not wearing glasses during her video appointment, but she was able to maintain good eye contact. *Id.* at 501. Finally, Dr. Steele reported that Claimant "appears able to follow instructions, both written and

spoken[,]" but does not explain in her records how she assessed Claimant's ability to follow written instructions given that her evaluation of Claimant took place by video. *Id.* at 503.

The Court now turns to the other vision-related conclusions that the ALJ reached when formulating Claimant's RFC. Specifically, the ALJ found that Claimant "can read large print, avoid ordinary hazards, view a computer screen and determine the differences in shape and color of small objects such as nuts, screws or bolts." Claimant asserts that these findings by the ALJ must necessarily be error because Ms. West specifically found that Claimant could not engage in these activities. However, as the Court has already determined, the ALJ did not err in finding that Ms. West's opinions were unpersuasive given that she had not treated Claimant for vision issues and provided no foundation for the opinions provided. Still, this finding by the Court does not end the inquiry. The Court must consider the ALJ's conclusions in light of Claimant's own statements.

While Claimant asserts that these conclusions by the ALJ ignore her valid reports of symptoms, after considering Claimant's testimony and other reports that she provided regarding her symptoms, it is evident that her statements are often contradictory regarding the extent of her limitations. For instance, on the one hand Claimant says that she cannot read a book, but then she says that she can read a newspaper if she holds it close to her face. As another example, Claimant reports that she can cook, vacuum, wash dishes, sweep, do laundry, and care for her mother and, at times, her infant grandson. At the same time, she states that she only sees "globs" on a television or computer screen even when close to them and has difficulty avoiding ordinary hazards due to her vision limitations. It is difficult to understand how Claimant could perform these reported household tasks and care for her mother and an infant if she cannot see screens when close to them and cannot reasonably avoid normal trip hazards. Of further note, at a time when Claimant initially claimed that she had become disabled, she was continuing to report that she mowed her own lawn

in a Function Report. Although she later stated that she no longer performed yardwork and reported that she had difficulty walking in parking lots because she could not see curbs well, Claimant's vision records from her treating optometrist show no deterioration in her vision between when she last reported mowing her yard and the report that she had stopped doing yardwork and had difficulty navigating when she was outside, nor did Claimant explain what had changed. As a final example, although Claimant testified that she could no longer see anything other than "globs" when watching the television or when trying to see the ALJ during her hearing, she said she could see a cellular telephone screen if she held it up close and could send text messages by enlarging the type and holding the screen close, could paint suncatchers, and was able to maintain good eye contact with Dr. Steele without having her glasses on during her video consultation.

After having assessed the information provided by Claimant as to her vision-related limitations, the Court will address specifically each of the remaining vision-related determinations made by the ALJ in formulating Claimant's RFC. In considering whether the ALJ erred in concluding that Claimant can read large print and view a computer screen, the record reflects that Claimant reported being able to read a newspaper if she held it close to her face and stated that she could see a cellular telephone screen and text from a cellular telephone if she enlarged the print. As such, the Court finds that Claimant's statements provide substantial record evidence to support this portion of Claimant's RFC. Then, as to the ALJ's determination that Claimant retained the ability to avoid ordinary hazards, the Court must find the activities in which Claimant continued to engage, as set forth above, provide more than ample evidence to support this finding, especially her report that she cared for her infant grandson. The Court notes that the issue of whether Claimant retained the ability to determine the differences in shape and color of small objects such as nuts,

screws, or bolts is a closer call. Still, Claimant's statement to Dr. Steele that she painted suncatchers as a hobby does provide some support for this determination.

At the same time, even if the ALJ erred in finding that Claimant retained the ability to differentiate the shape and color of small objects, the Court would find the error to be harmless because the record evidence would still support a finding that Claimant was not disabled even if that portion of Claimant's RFC was removed. *See Pechatsko v. Comm'r of Soc. Sec.*, 369 F. Supp. 2d 909, 914-15 (N.D. Ohio 2004) ("For a court to affirm on the ground of harmless error, two preconditions must exist: (1) a fully developed record as to all factual issues essential to the decision, and (2) no substantial doubt that the agency would have made the same ultimate finding without the erroneous, subsidiary finding removed from the picture.") (citing *Berryhill v. Shalala*, 4 F.3d 993 (6th Cir. 1993)). Based upon the RFC formulated by the ALJ, the vocational expert who testified determined that Claimant retained the ability to perform work as an agricultural produce packer, day worker, and linen room attendant. None of these occupations, as defined in the Dictionary of Occupational Titles, would require Claimant to be able to differentiate between the shapes and colors of objects as small as nuts, screws, or bolts. As such, the Court must find that the ALJ would have found Claimant not to be disabled even if he had erred in this finding.

## IV.    CONCLUSION

After a careful review of the record in this cause, the Court cannot find that the ALJ erred in his assessment of the medical evidence addressing Claimant's vision issues, and further finds that any error in the ALJ's formulation of Claimant's RFC was harmless.  Accordingly, the Commissioner's Motion for Summary Judgment [Doc. 31] is **GRANTED**, and the final decision of the agency is affirmed.

SO ORDERED:

/s/Cynthia Richardson Wyrick
United States Magistrate Judge